# EXHIBIT-1

1          **FACTUAL BASIS**

2      If this case proceeded to trial, the United States would prove

3  the following facts, among others, beyond a reasonable doubt:

4  **I.   INTRODUCTION**

5      Beginning in 2001, defendant Pacific Eurotex Corporation

6  ("defendant"), was a wholesale textile concern doing business in Los

7  Angeles County, California, within the Central District of

8  California, operated by co-defendants Morad "Ben" Neman ("Morad

9  Neman"), Chief Executive Officer ("CEO") and Hersel Neman, Chief

10 Financial Officer ("CFO").  Defendant was owned by two trusts, the

11 Neman Family Irrevocable Trust, and the Yedidia Investment Defined

12 Benefit Trust.  Co-defendant Morad Neman was the beneficiary of the

13 Yedidia Investment Defined Benefit Trust.  Co-defendant Hersel Neman

14 and his unindicted brother, Sion Neman, were the beneficiaries of the

15 Neman Family Irrevocable Trust.  Co-defendant Morad Neman was the

16 trustee for both these trusts.

17     Beginning in approximately 2012 and continuing at least through

18 September 10, 2014, defendant, co-defendant Morad Neman, co-defendant

19 Hersel Neman, and co-defendant Alma Villalobos ("Villalobos"), (who

20 was employed as the in-house accountant and bookkeeper for

21 defendant), engaged in a scheme to hide the fact that, in payment for

22 the invoices of certain customers, defendant was accepting cash that

23 was the proceeds of unlawful activity, namely, drug trafficking.  In

24 addition, defendant failed to file required reports regarding the

25 receipt of such cash, and failed to report that cash as income on

26 defendant's corporate tax returns for the years in question.  As part

27 of the scheme to conceal the receipt of cash and prevent it from

28 being reported as income on the corporate tax returns, defendant,

24

through co-defendants Morad Neman and Hersel Neman, either deposited or instructed co-defendant Hersel Neman's brother-in-law, co-defendant Mehran Khalili ("Khalili"), to deposit structured amounts of cash into the personal Wells Fargo bank account of co-defendant Hersel Neman's wife, Mojgan Neman ("the Wells Fargo account").  These deposits were divided into increments less than $10,000 each, with the intent to prevent the bank, a domestic financial institution, from filing Currency Transaction Reports.  Co-defendant Morad Neman had power of attorney for the Wells Fargo account and regularly transferred funds from that account to accounts controlled by members of the Neman Family, including the Neman Family Irrevocable Trust and the Yedidia Investment Defined Benefit Trust.

**II.  RECEIPT OF CASH PROCEEDS FROM UNLAWFUL ACTIVITY**

Defendant, through its agents co-defendants Hersel Neman and Villalobos, received cash payments under circumstances that demonstrated the funds were from unlawful activity, in particular drug trafficking, as evidenced by the following:

- The cash deliveries involved large amounts of United States currency which, in an ordinary business of this type, and as was the actual practice with the majority of defendant's customers, would be paid by check, wire transfer, or credit card;

- The cash deliveries were made by individuals unknown to defendant or to any of defendant's employees;

- The cash deliveries were made on behalf of defendant's customers by individuals who had no known connections to those customers;

- The cash deliveries, which typically involved tens of

2

1    thousands of dollars, were made in small denominations of $20
2    or less that was bundled with rubber bands, rather than bank
3    wrappers.
4    Moreover, defendant failed to file required reports regarding
5    the receipt of such cash.  On or about May 13, 2013, Special Agents
6    from the Department of Homeland Security warned defendant through its
7    agents, co-defendants Hersel Neman and Villalobos, that the delivery
8    of United States currency in payment for open invoices was a method
9    of money laundering used by drug traffickers and other illicit actors
10   operating in the Los Angeles Fashion District and other business
11   districts of Los Angeles.  Further, the Department of Homeland
12   Security agents instructed defendant's agents, co-defendants Hersel
13   Neman and Villalobos, that defendant must file a Form 8300 reporting
14   the receipt of United States currency over $10,000 for each such
15   transaction.  In the presence of the Homeland Security agents, co-
16   defendant Hersel Neman instructed co-defendant Villalobos to make
17   sure that the customers who brought cash filled out the Form 8300.
18   Both co-defendants Hersel Neman and Villalobos, acting as agents of
19   defendant, signed a form indicating their understanding of the Form
20   8300 requirement.
21   After receiving these warnings, defendant, through co-defendants
22   Hersel Neman and Villalobos, received the following deliveries of
23   bulk United States currency that was the proceeds of drug
24   trafficking:

25   • On or about May 30, 2013, an individual delivered
26     approximately $50,000 in United States currency that was the
27     proceeds of drug trafficking to defendant on behalf of
28     customer "Abraham Dichy" as payment for merchandise.  The

3

individual was in fact an undercover agent, and therefore was
not known to defendant or any of its employees, and was not
affiliated with any of its customers or suppliers.  The
undercover agent carried the United States currency, which
was bundled with rubber bands and consisted mostly of $20
bills, in a plastic sack.  When the undercover agent arrived
at Pacific Eurotex, co-defendant Hersel Neman confirmed the
amount the undercover had brought ($50,000), and called for
co-defendant Villalobos.  Co-defendant Villalobos then met
the undercover agent, counted the cash with a money counter,
separated the money, and bundled it by denomination.  When
the undercover agent asked for a receipt, co-defendant
Villalobos replied that Pacific Eurotex did not provide
receipts and would instead communicate directly with its
customer about the receipt of payment for an outstanding
order.  Defendant never filed a Form 8300 for this receipt of
cash.

- On or about June 7, 2013, the undercover agent delivered
  approximately $70,000 in United States currency that was the
  proceeds of drug trafficking to defendant on behalf of a
  customer as payment for merchandise.  The undercover agent
  carried the United States currency, which was bundled with
  rubber bands and consisted mostly of $20 bills, in a plastic
  sack.  The undercover agent asked for co-defendant Villalobos
  and informed co-defendant Villalobos that the payment was on
  behalf of customer "Mayer."  Co-defendant Villalobos used a
  money counter to count the currency and did not provide a
  receipt to the undercover agent.  Defendant never filed a

4

1    Form 8300 for this receipt of cash.

2    • On or about August 1, 2013, the undercover agent delivered
3    approximately $100,000 in United States currency that was the
4    proceeds of drug trafficking to defendant on behalf of a
5    customer as payment for merchandise.  The undercover agent
6    carried the United States currency, which was bundled with
7    rubber bands and consisted mostly of $20 bills, in a plastic
8    sack.  The undercover agent asked for co-defendant Villalobos
9    and informed Villalobos that the payment was on behalf of
10    customer "Mayer."  Co-defendant Villalobos used a money
11    counter to count the currency.  The undercover agent asked
12    co-defendant Villalobos for a receipt, and co-defendant
13    Villalobos responded that Pacific Eurotex does not provide
14    receipts.  Defendant never filed a Form 8300 for this receipt
15    of cash.

16    • On or about August 9, 2013, the undercover agent delivered
17    approximately $149,935 in United States currency that was the
18    proceeds of drug trafficking to defendant on behalf of a
19    customer as payment for merchandise.  The undercover agent
20    carried the United States currency, which was bundled with
21    rubber bands and consisted mostly of $20 bills, in a plastic
22    sack.  The undercover agent asked for co-defendant Villalobos
23    and informed Villalobos that the payment was $150,000 on
24    behalf of customer "Mayer."  Co-defendant Villalobos used a
25    money counter to count the currency and informed the
26    undercover agent that the money was short.  The undercover
27    agent asked co-defendant Villalobos to provide some type of
28    writing to indicate the deficiency in amount.  Although co-

defendant Villalobos responded that "Mr. Hersel" (referring
to co-defendant Hersel Neman) did not like to issue receipts,
Villalobos provided the undercover agent with a scrap piece
of paper which read "received 149,935."  Defendant never
filed a Form 8300 for this receipt of cash.

Thus, defendant received at least $369,935 in United States
currency that was the proceeds of drug trafficking in payment for
merchandise purchased by certain customers.

**III. MONEY LAUNDERING SCHEME**

The scheme to launder the illicit drug trafficking proceeds
defendant received involved (1) falsifying sales invoices and hiding
the receipt of cash by a system of double accounting; and (2)
conducting financial transactions with those funds by structuring
them into a non-business bank account in amounts under $10,000 to
avoid the bank's reporting requirements as follows:

**A.    Double Accounting**

Defendant, through its agents and co-defendants Morad Neman,
Hersel Neman and Villalobos, intentionally did not record the receipt
of the United States currency described above in its regular
electronic accounting database.  Rather, co-defendants Hersel Neman
and Villalobos kept track of the receipt of the cash on separate
ledgers, and defendant Hersel Neman altered or caused the alteration
of invoices to show that the value of each sale was zero to keep the
income from appearing in the regular electronic accounting database.
In this way, defendant was able to account for the reduction in
inventory and the associated cost of goods sold without acknowledging
the associated income.

6

**B.   Structuring Receipts of United States Currency**

After defendant received the cash from certain customers, co-defendants Hersel Neman and Villalobos gave the cash either to co-defendant Morad Neman or, at the direction of co-defendant Morad Neman, to co-defendant Khalili or to an unindicted co-conspirator working for co-defendant Morad Neman.  Co-defendants Morad Neman and Hersel Neman then either structured or instructed co-defendant Khalili to structure the cash deposits into the Wells Fargo account in amounts under $10,000 to prevent the bank from filing Currency Transaction Reports and thus evading the Currency Transaction Report requirement.

In the course of the scheme, from approximately January 3, 2012 through March 26, 2014, co-defendants Morad Neman and Hersel Neman made or caused co-defendant Khalili to make approximately 384 structured deposits of United States currency totaling $3,178,230 of defendant's income into the Wells Fargo account.  Then, exercising power of attorney, co-defendant Morad Neman transferred or caused the transfer of funds from the Wells Fargo account into the accounts for the Neman Family Irrevocable Trust, the Yedidia Investment Defined Benefit Trust, or other accounts controlled by members of the Neman Family, via wire transfer or cashier's check.

**C.   Filing False and Fraudulent Tax Returns**

In preparation for the filing of defendant's corporate tax returns at the end of each year, co-defendants Hersel Neman and Villalobos reviewed defendant's business records, including the regular electronic accounting database and bank statements, with defendant's corporate accountants.  However, because defendant, by its agents, co-defendants Hersel Neman and Villalobos, intentionally

7

1  falsified sales invoices using the double accounting scheme described
2  above, the records provided to the accountants did not properly
3  reflect all of defendant's sales.  Accordingly, the tax returns
4  correctly reflected the total cost of goods sold, as a deduction from
5  income, they omitted the sales associated with the falsified invoices
6  and therefore did not properly reflect defendant's total income.
7  Defendant, and co-defendants Morad Neman, Hersel Neman, and
8  Villalobos knowingly and intentionally concealed the separate cash
9  ledgers, and the receipt of the cash recorded therein, from the
10 accountants who prepared defendant's corporate tax returns.
11 Defendant, through its agents, co-defendants Morad Neman and Hersel
12 Neman, met with defendant's corporate accountants to finalize
13 defendant's tax returns, and authorized the filing of the tax returns
14 knowing that the records found in the regular electronic accounting
15 database that were provided to the accountants did not reflect the
16 total amount of income to co-defendant Pacific Eurotex, and that the
17 cash receipts related to the invoices recorded in the separate
18 ledgers also were not included in the computation of income..

19      Since the cash was deposited into a separate, personal bank
20 account controlled by co-defendant Morad Neman, and since the records
21 of that bank account and the separate ledgers were never provided to
22 defendant's accountants, defendant, through its agents co-defendants
23 Morad Neman, Hersel Neman, and Villalobos, prevented defendant's
24 accountants from learning even of the existence of those cash
25 receipts.  Defendant, through its agents, co-defendants Morad Neman,
26 Hersel Neman, and Villalobos, knew that the true invoices, and the
27 records of cash receipts that would have demonstrated the falsity of
28 the altered invoices, were never revealed to the accountants

8

1  responsible for preparing defendant's tax returns.  Therefore,

2  defendant, through its agents co-defendants Morad Neman, Hersel Neman

3  and Villalobos, caused the filing of false and fraudulent tax

4  returns.  Defendant, having failed to properly document all of its

5  income, then failed to properly document the distribution of income

6  to its shareholders, the Neman Family Irrevocable Trust and the

7  Yedidia Investment Defined Benefit Trust.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9